# 146009047

FILED

2017 OCT 13 PM 1:44

U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PAUL SPIVAK<br>34099 Melinz Pkway<br>Unit E<br>Eastlake, OH 44095<br><br>Plaintiff<br><br>-vs-<br><br>PETLAND, INC.,<br>250 Riverside Street<br>Chillicothe, OH 45601<br><br>and<br><br>PETLAND MONROEVILLE<br>4082 William Penn Hyw.<br>Monroeville, PA 15146<br><br>and<br><br>Dr. Robert Showalter, DVM<br>GOLDEN MILE ANIMAL CLINIC<br>1835 Golden Mile Hyw.<br>Plum, PA 15239<br><br>and<br><br>PAWSitive Solutions, Inc<br>3380 Lacrosse Lane, Suite 100<br>Naperville, Illinois 60564<br><br>and<br><br>JON P. GOMOLA<br>General Manager<br>4082 William Penn Hwy.<br>Monroeville, PA 15146<br><br>and | CASE NO.<br><br>JUDGE<br><br>1:17 CV 2172<br><br>**COMPLAINT**<br><br>**With Jury Demand**<br><br>JUDGE GWIN<br><br>MAG. JUDGE BAUGHMAN |

| | |
|---|---|
| KALI SARVER<br>Pet Counselor<br>4082 William Penn Hyw.<br>Monroeville, PA   15146 | ;<br><br>:<br> |
| and | : |
| RYAN AHRENHOLTZ<br>Breeder<br>312 Main Avenue<br>Defiance, IA   5127 | :<br><br>:<br><br>: |
| Defendants. | : |

Plaintiff Paul Spivak ("Spivak" or "Plaintiff"), brings this action against national animal retailer Petland, Inc., its franchise "Petland Monroe," Golden Mile Animal Clinic, PAWSitive Solutions, Inc. (aka "Solutions.pet"), and individuals Jon P. Gomola, Kali Sarver and Breeder Ryan Ahrenholts, collectively with all others, Defendants.  Plaintiff alleges, based upon personal knowledge and as to his own acts, upon information and belief as to other matters that follow:

## ALLEGATIONS

1) This action is against Petland, Inc., a nationwide pet store with a franchise located in Monroeville, PA. and employees who are employed by the franchise, Petland Monroeville.

2) Petland conspires in a fraudulent scheme with franchises, to deceive and defraud customers.  As a direct result of their scheme, Plaintiff, as well as other customers, pays inflated premium prices for pets that are falsely certified as being healthy, and sold with sham services and promises of veterinary care.  The overly-inflated prices are based upon Defendant's certification of the pet's health.

3) Petland induces unsuspecting customers into purchasing and paying highly inflated prices for puppies and kittens which are allegedly "certified" by a veterinarian and described as "vet

checked at least twice," are "healthy," and/or "fit for sale." The reality, however, is Petland fails to ascertain the health of these animals, many whom are knowingly sourced from inhumane "puppy mills" and arrived at Petland with infectious diseases or other health issues that are never diagnosed by Petland inspections.

4) At best, these inspections are cursory, and at worst, animal documentation is literally "rubber-stamped" with a veterinarian's signature without a veterinarian ever inspecting the animal. Moreover, given Petland's knowledge of the source of these animals – often from "puppy mill" operations – Petland maintains actual knowledge that many of the animals it certifies as "healthy," in fact, suffer from health defects that cannot be ascertained from even a good faith veterinary inspection (much less a cursory or non-existent "inspections" actually performed by Petland's veterinarians).

5) The veterinarian who supposedly perform these inspections derive a substantial portion of their total revenue from Petland. They are financially incentivized to certify these animals as healthy and fit for sale because of their compensation arrangement, and because Petland has already paid for the animals. By way of example, one of Petland's former "preferred veterinarians" affirmed in an unrelated matter that the overwhelming majority of animals certified as "healthy" were actually sick as a result of "puppy mill" breeding when they arrived at a Petland store, and that Petland attempted to sell these animals as pets during the incubation, period before any symptoms of illness might become apparent to the customer.

6) Petland furthers its fraudulent conspiratorial scheme by offering sham advisory and veterinary services that serve chiefly to dissuade the customer from seeking any independent veterinary assistance, and in some instances, as a vehicle for the selling the customer additional items such as foods and "registration kits." Undeniably, Petland requires customers to sign a "Limited Puppy Purchase Contract" which they agree to contact PAWSensitive and to use

2

Petland "preferred veterinarians" for the health needs of their pets.

7) Petland has been able to successfully execute the conspiratorial fraudulent scheme by concealing from its customers, among other things: a) that its inspections of animals by veterinarians with financial ties to Petland are inherently unreliable and are performed after Petland has already purchased the animals; b) that PAWSitive is an affiliate of Petland that exists to maximize store profits, not an independent claims agency for pet owners; and, c) that Petlands "preferred veterinarians" are likewise incentivized or instructed to act in the best interest of Petland, and not its customer and/or their pets.

8) Petland is able to perpetuate this conspiratorial scheme on a national scale in retail stores throughout the country because franchisees are governed by an agreement that requires uniform standards, methods, and techniques in running their Petland stores, and adherence to detailed and strict internal standards for dog and cat sales. Petland also requires uniform franchisees to undergo training to insure uniformity of procedures, and uses Petland in Kennesaw, GA to train and instruct other franchisees in furtherance of their conspiratorial unlawful scheme.

9) Plaintiff Paul Spivak brings this lawsuit against named Defendants after he purchased an animal for a pet with the accompanying certifications, services and access to veterinary care. Plaintiff brings claims for violation of federal laws. Plaintiff seeks damages, including a trebled award as allowed, and injunctive relief.

## JURISDICTION AND VENUE

10) This Court has federal question subject matter jurisdiction over the conduct complained of herein under 28 U.S.C. subsection 1331. Declaratory relief is available pursuant to 28 U.S.C. subsection 2201.

11) This Court has personal jurisdiction over the Defendants because some Defendants are residents of the State of Ohio and/or personally availed themselves of the privilege of conducting business in the State of Ohio. Ohio-based Defendant Petland, Inc. maintains close ties to its Monroeville franchise and other franchises in Pennsylvania and Ohio, receiving substantial revenue from the stores through royalties. Illinois-based PAWSitive is Petland's purported customer service agent, serving Petlands Pennsylvania and Ohio franchises and regularly interacting with Ohio purchasers of Petland's animals. This Court also has personal jurisdiction over all Defendants pursuant to 18 U.S.C. subsection 1965(d) which provides for nationwide service of process.

12) Venue is proper in this Court pursuant to 28 U.S.C. subsection 1391 because many of the events, acts and transgressions giving rise to this action occurred in this District, and because some of the Defendants:

   a. Have intentionally availed themselves of the laws and markets within the District through promotion, marketing, distribution, and sale of pets in this District;

   b. Do substantial business in this District, including maintaining its principal place of business in this State; and

   c. Are subject to personal jurisdiction in this District.

## THE PARTIES

### Defendants

13) Defendant Petland, Inc. is an Ohio Corporation with a registered principal place of business at 250 Riverside St., Chillicothe, Ohio 45601. Petland, Inc. was registered with the Pennsylvania Secretary of State as a foreign corporation with a registered agent for service.

4

Petland Inc. is the largest national retailer selling puppies to consumers and conducts its operations through approximately 131 retail store franchises in the United States.

14) Petland, Inc. exercises strict control over, and mandates uniformity from its franchisees. As stated in a franchise agreement from a Sarasota, FL store that Petland, Inc., publicly filed in unrelated litigation, Petland, Inc. provides extensive training to its franchisees on its "unique system," which it defines as "the uniform standards, methds, techniques, and expertise, procedures and specifications developed... for establishing, operating and promoting a retail business." According to Petland, Inc., "the distinguishing characteristics of Our System. include...operating methods, and techniques for inventory and cost controls," and the "Confidential Operating System" and "Confidential Information," among other features. Upon information and belief, the use of animal certifications, preferred veterinarians, and customer service providers such as PAWSitive are typical or standard practices at Petland stores.

15) Franchisees receive three weeks training of training at Company headquarters and three more weeks in their new store. Petland, Inc. also provides one-week training, in person training session at a high-volume franchisee. Petland, Inc. receives royalties from its franchisees based on their success. In the case of the Sarasota, FL franchise for example, the franchisee pays Petland, Inc. a weekly royalty fee of 4.5% of gross revenues.

16) Defendant Petland Monroeville is a typical franchisee of Petland, Inc. It conducts its primary business in Monroeville, Pennsylvania. The general manager, Jon Gomola. Karli Sarver, who acts in the position of pet counselor, and assists Petland Monroeville in perpetrating their scheme.

17) Petland Monroeville maintains a business relationship with a veterinarian named Robert Showalter who operates through Golden Mile Animal Clinic, whereby Showalter, acting in concert with Petland Monroeville and/or their agents, was responsible for inspecting shipments

5

of animals to Petland Monroeville from puppy brokers and/or breeders located in Pennsylvania or out of state.

18) Like preferred vets used by all franchisees, Showalter agreed to certify the health of puppies sold by Petland Monroeville. Upon information and belief, in practice, however, Showalter often failed to conduct any veterinary examination of the puppies, leaving it to lay store employees to "rubber stamp" health certificates or vaccination certificates in Showalter's stead.

19) Upon information and belief, this practice is not unique or atypical to Petland Monroeville or Showalter. Regardless, even where an actual veterinary examination were illusory, given that many of the likely conditions and diseases to which Petland's puppies and kittens were exposed would be latent until after the examination and after the customer purchased the puppy or the kitten and took it home.

20) Undeniably, Petland's scheme largely revolved on that knowledge of the latent defects and diseases possessed by the puppies it was selling. Petland therefore used the illusory health certificates to convince customers to purchase puppies that it knew may very well have latent diseases, and then used it service providers to try to conceal its fraud from customers whose puppies and kittens were necessarily susceptible to serious health issues and disease.

21) The entity used by Petland to conceal this fraud is Defendant PAWSitive Solutions, Inc. a.k.a. Solutions.pet. PAWSitive is an Illinois Corporation with its principle offices located at 3380 Lacrosse Lane, Suite 100, Naperville, Illinois 60564. Upon information and belief, PAWSitive is contracted by Petland Inc. and Petland franchisees nationwide (in addition to Petland Monroeville). PAWSitive holds itself out to be a customer "claims" manager or "Concern Specialist" offered to Petland pet purchasers. Pursuant to its warranties, Petland instructs customers to call PAWSitive as a matter of first recourse if the animal is found to be ill after purchase.

22) Well known by Petland, however, PAWSitive is not a veterinary clinic and does not provide independent pet care advice to Petland customers. Instead, it acts in concert with Petland to direct customers to Petland's preferred veterinarians, and to divert or dissuade customers from attempting to make good on Petland's warranties. PAWSitive also exists to sell additional services and programs to Petland customers after the purchase of their pets, such as special registrations.

23) PAWSitive's corporate registration lists five other "Assumed Names," one of which is Third Party Pet. The website for this entity reveals the true corporate purpose for PAWSitive, and states that the entity "is not just a third-party service company . . . *we act as business consultant, to help pet store owners increase their profitability, than we do a service company.* The website further confirms that the entity to exsists to fix "hole in the management of pet store sales and procedures," and contains nine testimonials – all from Petland Franchises. Petland conceals these damning facts about PAWSenitive (a.k.a. Solutions.pet) from customers at the point of sale, making warranties for "services" from PAWSensitive, a sham.

24) In spite of paying for the health certifications for services from PAWSensitive and Petlands "preferred veterinarians" as part of purchase prices for their pets, Petland concealed from Plaintiff Spivak, that PAWSensitive (Solutions.Pet) were directed to take actions that were in the best interests of Petland – not the customers and animals for whom the purported to provide service. However, the warranties and representations provided to all customers implied that these Defendants would provide independent and impartial professional services and advice, and would serve the best interests of the customer and their pets, not the financial interest of Petland.

25) Plaintiff alleges upon information and belief, that at all times, Defendants' breeders, inclusive

26) Defendant Breeder Ryan Ahrenholtz, agents, employees representatives, executives, directors, partners and subsidiaries were acting within the course and scope of such agency, employment, and representation, on behalf of Defendants.

**Plaintiff Paul Spivak**

27) Plainttiff Paul Sprivak is an individual who resides in, and is a citizen of the State of Ohio. On August 10, 2017, Plaintiff purchased a German Shepard puppy from Petland Monroeville, in Monroeville, PA for the total purchase price of $3,370.49. The purchase price was offered by Petland and included: (a) the animal himself; (b) the value of a certification that the animal had been inspected by a veterinarian prior to purchase and was healthy and fit for sale; and (c) the value of animal care services through PAWSensitive (a.k.a. Solutions.pet) and Petland's preferred veterinarians. The price of purchase also included a triple vet check; vaccinations and deworming; one year health warranty; 30 day Health Insurance; FREE Lifetime Training Assistance and DVD; three generation pedigree and registration info; spay and neuter reimbursement (store credit); Initial vet examination reimbursement (store credit); free microchipping; vet care for initial ten days' Lifetime AKC Pet Recovery Service; a dog crate and supplies.

28) Prior to purchase, Plaintiff viewed two puppies. The dogs were shown in in small areas where potential customers could interact with the pet. After viewing the first puppy, Plaintiff requested a look at a second German Shepard puppy. Defendant Kali Sarver, pet counselor, immediately moved the Plaintiff to a second area for the showing. The Defendant knew, or should of known, that the second puppy was sick with an infectious illness, but purported to the Plaintiff was healthy and fit for sale.

29) At the time of purchase, Defendant Sarver, a Petland Monroeville employee, gave Plaintiff Spivak a Certificate of Veterinarian Inspection stating that that Showalter had certified the

8

German Shepard puppy as healthy, fit for adoption, and free of parovirus, a serious health condition in dogs. In deciding to purchase the puppy, Spivak relied on and valued these assurances that the puppy was healthy and ready to bring home.

30) Petland Monroeville also provided Plaintiff Spivak with a "Limited Puppy Purchase Contract" that warranted that care through PAWSitive and their preferred veterinarians, as well a refund or replacement for his puppy under certain circumstances. Along with this contract, Petland

31) Monroeville gave Plaintiff written instructions and explanation sheet on the "common" puppy illnesses of hypoglycemia and canine cough. He took the puppy home on August 10, 2017.

32) As soon as the puppy arrived at Spivak's home on the day of the purchase he was acting lethargic. Because he was told the puppy had kennel cough and given antibiotics Spivak continuously monitored the puppy. Within 48 hours of the puppy's arrival the dog began vomiting and had continuous diarrhea. The puppy was so ill that Spivak was forced to admit him for emergency treatment to a local vet at the Animal Hospital, Inc., unaffiliated with Petland. The puppy was admitted for observation and testing, as he was profoundly ill. A series of tests were ran and it was determined the puppy had parvovirus. The puppy was near death. The virus effects dogs gastrointestinal tracts and is spread by direct dog to dog contact or contact with contaminated dog feces.

33) Parvovirus is a life-threatening disease in puppies, however, Defendant Showalter provided no treatment for the life-threatening illness, instead treating the puppy for kennel cough.

34) Spivak contacted Petland Monroeville and spoke with Defendant Jon Gomola, the purported general manager. Plaintiff explained the situation with the puppy as it occurred and requested a refund of his veterinarian treatment payment and for the cost of the severely ill puppy.

9

35) Defendant Gomaola claimed that he was not authorized to reimburse clients for veterinarian treatment costs that occur outside of their preferred treatment veterinarians and that he would contact Solutions.pet and speak to them on Spivak's behalf. To date, Defendant has made a reimbursement of $400.00 of Plaintiff's $2000.00 in veterinary care to save the puppy and protect his investment. They refuse to refund cost of puppy.

36) Petland gives a certificate of a "Veterinarian Health Exam" to all animal purchasers at the time of sale, certifying that each animal is "free of any internal or external parasites" and "healthy and fit for adoption." Similar certification language is included in the "Limited Puppy Purchase Contract" that is also provided to each customer, which states that each animal "has been vet checked twice before being sold" and is "free of parvovirus, distemper, hepatitis [sic], corona virus, and canine influenza for ten days from the date of purchase." The contract further states that Petland "has taken every step possible to sell a quality pet."

37) Upon information and belief, Petland pays the preferred veterinarians a fixed rate each month in exchange for their agreement to certify that they have inspected each shipment of puppies and kittens, and that each animal is "healthy" and "fit for adoption."

38) These certifications allow Petland to inflate the prices of the animals they sell since Petland leads customers to believe they are purchasing a healthy pet.

39) Upon information and belief, the scheme to misrepresent and conceal the true health risks of Petland's animals, and to sell them before symptoms of disease can manifest, is part of the "unique system" that has been exported to franchisees around the country in order to drive up profits. Petland, Inc. financially incentivizes its franchisees and employees to sell pets regardless of the animals' health. Sales are commission-based with each employee receiving a percentage of the animals' purchase price.

39) Petland gives customers two instructional sheets regarding hypoglycemia and "canine cough" (also called kennel cough) that are designed to conceal Petland's fraud by dissuading customers from seeking immediate veterinary assistance for potentially life-threatening conditions.

40) The canine cough instructions state that "gagging cough, sometimes accompanied by sneezing and nasal discharge," while "annoying... does not usually develop into anything more serious." These instructions also state that canine cough "is not cured, but must run its course."

41) By analogizing canine cough to the common cold, Petland leads customers to believe that upper respiratory illness in dogs is not a cause for concern. This deters new puppy purchasers from seeking immediate veterinary attention for their dangerously sick puppies, who may develop life-threatening pneumonia from untreated canine cough. Dissuading customers from seeking medical attention for canine cough also protects Petland from having to pay for dogs' care under its warranties. The fact that Petland provides all customers with this document also demonstrates that it is fully aware that it is selling dogs that are highly likely to have health defects and its supposed certifications of health are false.

42) The hypoglycemia handout has a similar purpose. The sheet warns that if the puppy is hypoglycemia caused by the "stress" of its new environment or too much play. Petland thus instructs customers to "limit your puppy's amount of play," "make sure he eats his meals," and give him certain supplements and dissuades seeking veterinarian treatment. The handout makes clear that illness and death due to hypoglycemia is the customer's responsibility or fault, not Petland's.

43) Like the instruction sheet for canine cough, the hypoglycemia instructions give the customer the illusion that a puppy's lethargy, unresponsiveness, and unwillingness to eat are symptoms of a preventable condition caused by the customer's actions as opposed to a serious illness present in the animal at the time of purchase, like parvovirus.

11

44) Petland's representations regarding hypoglycemia and canine cough are part of its deceptive scheme to conceal any serious health issues an animal may have at the time of purchase, and to deter customers from seeking necessary veterinary treatment for their pets that Petland would be obligated to reimburse under its warranties.

45) Defendants' fraudulent scheme to conceal and/or misrepresent the health risks of animals by selling customers illusory and/or valueless certifications, services, and warranties. Plaintiff purchased an animal relying on Petland's warranties about its certification process and the services PAWSitive and the preferred veterinarians would provide. Defendants conspired to

46) Defendant participants were aware of, and participated in, a common plan of concealing and misrepresenting the health risks of Petland animals and the nature of Petland's certifications, warranties, and services.

47) Defendant did so knowingly, so as to avoid having to honor those warranties or provide competent and unbiased services, and to maintain their mutually beneficial business relationships. The sole purpose of the scheme was to keep costs down for Petland and enable it to churn out animal and warranty sales, generating substantial revenue for Defendants.

48) Defendants willfully and knowingly conspired with each other, as well as others known and unknown to Plaintiff and the Classes, to engage in various activities giving rise to this action, and aided and abetted one another in these activities,

### Injury to Plaintiff

49) Plaintiff has been injured by Defendants' fraudulent scheme. Relying on Defendants' representations regarding their animals' health risks, services, and warranties, Plaintiff paid a

premium for an animal that were not meaningfully inspected by a licensed veterinarian, and for certifications, services, and warranties of minimal or no value.

50) Had Defendants not engaged in the above-described pattern of activity, Plaintiff would not have been duped into purchasing a puppy and a warranty, or would not have paid a premium price for the animal.

54) Defendants, their employees, affiliates, and multiple agents have joined in the conspiracies to violate the above enumerated provisions with various third parties not named as Defendants herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, prays for a judgment:

a. Providing compensatory or actual damages to Plaintiff for any wrongful act or practice under each cause of action where such relief is permitted;

b. Providing restitution and/or disgorgement of Defendants' profits from its unlawful conduct;

c. Providing incidental and consequential damages;

d. Enjoining Defendants from continuing the unlawful practices as set forth herein, including marketing or selling its animals while misrepresenting the animals' health risks and the nature and value of the accompanying certifications, services, and warranties, and directing Defendants to engage in corrective action such as disclosing the nature of the certification process and the relationships between and among the Defendants, or by providing other such injunctive or equitable relief;

f. Providing an award of treble damages;

g. Providing an award of punitive damages;

h. Awarding fees and costs;

i. Awarding pre-judgment and post-judgment interest at the legal rate;

and

j. Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues that are triable.

Dated: September 21, 2017

PAUL SPIVAK
34099 Melinz Pkway
Unit E
Eastlake, OH   44095
Phone (440) 668-4660
Email: gauge@en.com

Plaintiff *pro se*